# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

**HANNAH NEWELL**                                                                                          **PLAINTIFF**

**V.**                                **CASE NO. 5:17-CV-5028**

**BAILEY & OLIVER P.A.,**
**d/b/a BAILEY & OLIVER LAW FIRM,**
**and SACH OLIVER, individually**                                      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are a Motion to Dismiss (Doc. 19) and Brief in Support (Doc. 20), filed collectively by Defendants Bailey & Oliver P.A., d/b/a Bailey & Oliver Law Firm ("Bailey & Oliver"), and attorney Sach Oliver. Plaintiff Hannah Newell filed a Response in Opposition to the Motion (Doc. 24), and on May 5, 2017, the Court held a hearing in order to allow the parties to present oral argument. At the close of the hearing, the Court took the matter under advisement. For the reasons described below, the Motion to Dismiss will be **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

The 76-page Amended Complaint ("Complaint"), filed on March 8, 2017, describes the working environment at Bailey & Oliver and details a number of events that allegedly took place over the course of Ms. Newell's three-year tenure as an employee of the law firm, under the direct supervision of owner and manager Sach Oliver. Though the facts are exhaustively detailed, it remains unclear exactly which ones are stated for the purpose of supporting the causes of action pleaded, and which are mentioned merely for context or for some other purpose.

In any event, Ms. Newell worked for Bailey & Oliver from July 1, 2013, through July 1, 2016, and was originally hired as a paralegal. She refers to herself multiple times in the Complaint as a lawyer, but admits that she was not educated in the United States, was never licensed to practice law in any of the states, and is ineligible to sit for the bar examination in Arkansas.[1] Instead, she is a licensed solicitor of the senior courts of England and Wales, and she was educated exclusively in England. She was only licensed as a solicitor in March of 2013, approximately four months prior to beginning work as a paralegal at Bailey & Oliver, but she maintains that after about three months of working at the firm, "she met with Oliver and asked to be given responsibilities as a lawyer, with corresponding compensation." (Doc. 13, p. 5). According to Newell, Oliver "agreed to recognize [her] as having responsibilities of an associate attorney, together with an adjustment of her compensation consistent with the same," *id.*, and from that point onward, Oliver referred to Newell "as a lawyer," and noted the change on the firm's website and on Newell's business cards. Where previously the firm had recognized her as "Paralegal," her title was revised to "Solicitor of the Senior Courts of England and Wales." *Id.* Newell also maintains that her paralegal duties were shifted to two other employees, and she began performing "duties typically performed by an attorney." *Id.*

Throughout the Complaint, she describes a number of interactions she had with Oliver that she characterizes as not "appropriate," and that caused her to experience

---

[1] The Court questioned her directly during the Motion hearing as to these three points, and Ms. Newell stated that it was her understanding that, under the current rules governing admission to the Arkansas bar, it would not be possible for her to become licensed to practice law in Arkansas and enter her appearance as attorney of record in any particular proceeding.

embarrassment and discomfort. *See, e.g., id.* at 8. The Court will not set forth each such comment or interaction here, but suffice it to say that Newell felt that she was at times objectified by Oliver and treated in an unprofessional manner—in a way that male attorneys at the firm were not treated. She has not asserted a cause of action for hostile work environment or harassment, however—something the Court specifically discussed at length with Newell's attorney during the Motion hearing and confirmed on the record.[2]

Newell contends that, even though she was not licensed to practice law in Arkansas or anywhere else in the United States, Oliver reassured her "that for all practical purposes, [she] would be considered a lawyer for the firm, in that she would have the same responsibilities and would have the same compensation arrangement as the other employee lawyers of the firm." *Id.* at 7. She claims that she and another Bailey & Oliver attorney, Ryan Scott, possessed the same levels of experience and skill, worked on the same litigation team and on the same cases, and performed work on behalf of the same clients, but that Ryan was paid substantially more for his services than Newell—not in the form of base salary, which was comparable to Newell's, but in the form of bonuses. She contends, for example, that in 2014, Scott was paid in excess of $500,000.00, and Newell was paid less than $56,000.00, with the difference in the two amounts attributable to bonuses that were paid by Bailey & Oliver out of attorney's fee awards.

---

[2] During the hearing, Newell's attorney opined that the facts, as they are currently stated in the Complaint, are not intended to amount to a hostile work environment/sexual harassment claim, and, furthermore, are legally insufficient to state such a claim. Counsel did qualify, though, that Newell might wish to amend her Complaint to state such a claim in the future, should new facts come to light in discovery.

3

To illustrate how comparable Newell's job duties were to Scott's, she lists in the Complaint the following tasks that they both allegedly performed: (1) directing and training other employees, including attorneys, in assisting with projects; (2) attending and participating in litigation strategy meetings and decisions; (3) providing input into decisions regarding potential cases; (4) taking responsibility "for expert evidence"; (5) taking responsibility for "aspects of discovery"; (6) providing input into the draft work product of other attorneys and employees; (7) drafting pleadings; (8) performing legal research and writing; and (9) attending and participating in court proceedings and trials "as part of the trial team." *Id.* at 16.

Newell favorably compares her levels of skill, effort, and responsibility in working at Bailey & Oliver to Scott's, and argues that she suffered gender-based discrimination due to the fact that she was not compensated in the same manner as Scott for substantially the same work. She notes in the Complaint that "[o]n or around October 1, 2013, in Oliver's office at Bailey & Oliver Law firm, Oliver told Newell she would have responsibilities as an associate attorney, and that she would receive compensation based upon the same plan of compensation which was applicable to Scott and other associate attorneys." *Id.* at 20. Oliver had given her the "choice to be paid a higher salary with relatively lower bonuses—which would be 'low risk and lower income per year' or a 'low salary' and relatively higher bonuses—which would be higher risk but with a higher income potential per year." *Id.* at 21 (emphasis in original). According to Newell, she "accept[ed] this arrangement" offered by Oliver, understanding that she had elected the same compensation plan as Scott, involving working "for a low salary that only covered their

4

monthly expenses, with bonuses which made up the majority of their income, so they could make more money over time." *Id.*

At some point, it appears that the relationship between Newell and Oliver soured, at least in part due to Newell's dissatisfaction with her compensation. She recounts in her Complaint that as cases she was working on began to settle for tens of millions of dollars, and the law firm received millions of dollars in attorney's fees, "Oliver began to represent to Plaintiff reasons outside of their agreed criteria as to why the bonus compensation would be lower than expected or might not be paid." *Id.* at 25. She was concerned about how much she was being paid, but claims she felt "unable to complain . . . because she feared she would be terminated." *Id.* at 53. It was around this time—early to mid-2016—that Oliver began berating her more often, accusing her of having mental health issues, and dismissing or ignoring her complaints about "sexually discriminatory acts of conduct or statements . . . ." *Id.* at 50-52. Newell felt she was being shut out of discussions on cases to which she had devoted significant time. *Id.* at 53-54. As the formerly close working relationship between Newell and Oliver began to cool, and he communicated with her less often, Newell began to fear he "had plans to terminate her employment." *Id.* at 54-55. She resigned on June 14, 2016, although she characterizes her resignation as a constructive discharge. *Id.* at 55. Oliver then met with Newell, apologized to her, and persuaded her to return to work on June 18, 2016.

During the following week, Newell and Oliver disagreed about the handling of expert witnesses and other matters in a particular case, and as a result, Newell began to believe that Oliver's litigation choices amounted to "dishonest behavior." *Id.* at 57. The way she

monthly expenses, with bonuses which made up the majority of their income, so they could make more money over time." *Id.*

At some point, it appears that the relationship between Newell and Oliver soured, at least in part due to Newell's dissatisfaction with her compensation. She recounts in her Complaint that as cases she was working on began to settle for tens of millions of dollars, and the law firm received millions of dollars in attorney's fees, "Oliver began to represent to Plaintiff reasons outside of their agreed criteria as to why the bonus compensation would be lower than expected or might not be paid." *Id.* at 25. She was concerned about how much she was being paid, but claims she felt "unable to complain . . . because she feared she would be terminated." *Id.* at 53. It was around this time—early to mid-2016—that Oliver began berating her more often, accusing her of having mental health issues, and dismissing or ignoring her complaints about "sexually discriminatory acts of conduct or statements . . . ." *Id.* at 50-52. Newell felt she was being shut out of discussions on cases to which she had devoted significant time. *Id.* at 53-54. As the formerly close working relationship between Newell and Oliver began to cool, and he communicated with her less often, Newell began to fear he "had plans to terminate her employment." *Id.* at 54-55. She resigned on June 14, 2016, although she characterizes her resignation as a constructive discharge. *Id.* at 55. Oliver then met with Newell, apologized to her, and persuaded her to return to work on June 18, 2016.

During the following week, Newell and Oliver disagreed about the handling of expert witnesses and other matters in a particular case, and as a result, Newell began to believe that Oliver's litigation choices amounted to "dishonest behavior." *Id.* at 57. The way she

monthly expenses, with bonuses which made up the majority of their income, so they could make more money over time." *Id.*

At some point, it appears that the relationship between Newell and Oliver soured, at least in part due to Newell's dissatisfaction with her compensation. She recounts in her Complaint that as cases she was working on began to settle for tens of millions of dollars, and the law firm received millions of dollars in attorney's fees, "Oliver began to represent to Plaintiff reasons outside of their agreed criteria as to why the bonus compensation would be lower than expected or might not be paid." *Id.* at 25. She was concerned about how much she was being paid, but claims she felt "unable to complain . . . because she feared she would be terminated." *Id.* at 53. It was around this time—early to mid-2016—that Oliver began berating her more often, accusing her of having mental health issues, and dismissing or ignoring her complaints about "sexually discriminatory acts of conduct or statements . . . ." *Id.* at 50-52. Newell felt she was being shut out of discussions on cases to which she had devoted significant time. *Id.* at 53-54. As the formerly close working relationship between Newell and Oliver began to cool, and he communicated with her less often, Newell began to fear he "had plans to terminate her employment." *Id.* at 54-55. She resigned on June 14, 2016, although she characterizes her resignation as a constructive discharge. *Id.* at 55. Oliver then met with Newell, apologized to her, and persuaded her to return to work on June 18, 2016.

During the following week, Newell and Oliver disagreed about the handling of expert witnesses and other matters in a particular case, and as a result, Newell began to believe that Oliver's litigation choices amounted to "dishonest behavior." *Id.* at 57. The way she

was treated by Oliver made her convinced that he "did not respect her or care about her career . . . ." *Id.* She resigned for a second time on June 27, 2016, offering as justification her belief that Oliver "did not respect and value her and that she could no longer trust him." *Id.* She sent an email to Oliver on June 28, 2016, inquiring about how she would be paid for her work on several unresolved cases. In Newell's view, if the cases settled, or if the law firm's clients prevailed at trial, she would be entitled to bonus compensation based on the work and value she contributed to these cases.

Newell did not receive a satisfactory response to her email, and she returned to the office on June 29, 2016. While there, she discovered proof about her salary and compensation, as compared to Scott's. "[H]er suspicions were confirmed that Oliver had been giving her untrue statements and misrepresentations . . . regarding her position and the bonus scheme and that he had simply chosen to pay Plaintiff significantly less than what Oliver's representations to her required." *Id.* at 27. It became clear to Newell that she and Scott had been compensated based on different criteria. Newell accuses Defendants of concealing from her the fact that they never intended to pay her as an associate attorney from the very beginning, and they "considered the bonus compensation as 'discretionary.'" *Id.* at 32.

The Complaint sets forth multiple causes of action, including sex discrimination under Title VII of the Civil Rights Act and the Arkansas Civil Rights Act ("ACRA"), based on Newell's "compensation and the on the job treatment by Sach Oliver," (Doc. 13, p. 66); violations of the Equal Pay Act ("EPA"); violations of the Arkansas Deceptive Trade Practices Act ("ADTPA"); fraud; unjust enrichment; and promissory estoppel. As relief, she requests compensatory and punitive damages, costs and attorney's fees, and an injunction

with respect to fees received in cases in which Newell participated and billed time. Defendants have moved to dismiss the Complaint, arguing that Newell has failed to state plausible claims as to each of these causes of action.

## II. LEGAL STANDARD

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all of a complaint's factual allegations as true, and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.*

## III. DISCUSSION

### A. Title VII/ACRA Gender Discrimination

#### 1. Gender-Based Wage Discrimination

Newell's claim of gender discrimination is based on two things: "her compensation *and* on the job treatment by Sach Oliver." (Doc. 13, p. 66 (emphasis added)). Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Motion to Dismiss addresses the Title VII claim as one for "gender-based wage discrimination" only, *see* Doc. 20, p. 3, but the Court believes Newell has also attempted to assert a sex discrimination claim based on her treatment at the law firm, primarily by Oliver, over her three-year term of employment. The Court will therefore take up the issue of the Title VII claim for wage discrimination, and then turn to what it construes as a separate Title VII claim for disparate treatment based on gender.

Title VII gender-based discrimination claims alleging "unequal pay for equal work" are analyzed using the same framework as claims raised under the EPA. *See Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir. 2003). Therefore, the only way a plaintiff can establish a claim for gender-based wage discrimination under Title VII *without having to meet* the particular standards required to state a claim under the EPA, is if she could show that her employer "intentionally depresse[d] wages on account of sex and there were no employees of the opposite sex doing equal work for more pay." *Id.* In other words, a wage-based gender discrimination claim under Title VII will be grouped with an EPA claim

and evaluated under EPA legal standards unless there are no legitimate comparators of the opposite sex present in the subject workplace. Of course, in the instant case, Newell contends that she was the only female "attorney" at the firm, but there was at least one other male comparator, Scott, who allegedly performed the same work she did, but for substantially more pay—simply because he was a male. Her Title VII wage discrimination claim is not separate and apart from her EPA claim. Accordingly, the Court will analyze the Title VII wage discrimination claim along with, and in the context of, the EPA claim, at section III.B. of the Opinion.

### 2. Disparate Treatment

To state a claim for gender discrimination based on disparate treatment, under either Title VII or the ACRA,[3] an employee must plead facts sufficient to establish that she was a member of a protected class, was meeting the legitimate expectations of her employer, suffered an adverse employment action, and that an inference of discrimination may be drawn from these facts. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). The Complaint is unclear about what specific factual circumstances give rise to a Title VII claim—other than the unequal payment of bonuses. As previously explained, Newell makes no claim for a hostile work environment or for sexual harassment under Title VII. Moreover, her Complaint discusses a number of personal interactions she had with Oliver over the years of her employment that caused her discomfort and embarrassment, and which she characterizes as inappropriate. However, she does not connect any of these scattered comments, jokes, and interactions to her decision to quit her job. The

---

[3] Claims made under Title VII and the ACRA are evaluated using the same standards. *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009).

Complaint, as a whole, does not charge that Oliver created such an intolerable work environment for Newell that she was forced to quit due to some reason other than her compensation.

After separating Newell's wage-based discrimination claims from her more anecdotal disparate-treatment claims, it is clear that even though she is a member of a protected group and appears to have been meeting the legitimate expectations of her employer during her tenure at Bailey & Oliver, she fails to allege that she suffered an adverse employment action in the form of discipline, demotion, or firing, while her male comparator received no such punishment. She does claim that in the weeks before she resigned, she noticed that she was not being included in certain meetings and kept in the loop on client communications and case strategies. Because of this lack of communication, she believed Oliver was planning to terminate her. She quit twice—once on June 14, 2016, and for good on June 27, 2016. The Court finds, however, that she has failed to state facts that plausibly show she was constructively discharged, or that she suffered any adverse employment action due to gender.

The Eighth Circuit has explained that in order to establish a constructive discharge, a plaintiff must meet a high bar and show that conditions were so extraordinary and egregious that "a reasonable person in [her] situation would find the working conditions intolerable . . . ." *O'Brien v. Dept. of Agric.*, 532 F.3d 805, 810 (8th Cir. 2008) (quotation and citation omitted). When a claim for constructive discharge does not even rise to the level of establishing a claim for hostile work environment, then the claim must fail. *See id.* at 811 (citing *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1270-71 (10th Cir. 2004)

(recognizing high evidentiary burden needed to establish constructive discharge over other adverse employment actions)).

Because Newell has failed to state facts sufficient to show that she suffered an adverse employment action as a result of treatment in the workplace, comments made, or a particular atmosphere created by her employer—separate and apart from her allegations about wage discrimination—the disparate-treatment claim will be dismissed.

### B. EPA

As explained *supra*, the Court will now consider Newell's gender-based wage discrimination claim pursuant to both Title VII and the EPA under the EPA's legal framework. To state a claim for a violation of the EPA, a plaintiff must show that her employer discriminated against her on the basis of sex by paying a male employee or employees more than she was paid, for a job "requir[ing] equal skill, effort, and responsibility, and which [was] performed under similar working conditions." *Berg v. Norand Corp.*, 169 F.3d 1140, 1145 (8th Cir. 1999). Construing the facts in the Complaint in the light most favorable to Newell, the Court finds that her wage discrimination claims under Title VII and the EPA must fail.

In ordinary circumstances, the Court would question the propriety of dismissing an EPA claim at this early stage of the litigation, on a motion to dismiss, and prior to the full development of the facts through discovery. However, in this particular case, the length and detailed nature of the Complaint provide the Court with sufficient information to conclude that the salient facts, as pleaded by Newell and as assumed by the Court to be true, fail to establish a claim for gender-based wage discrimination. This is because the

job for which Newell was paid could not possibly have required the same skill, effort, and responsibility as the job performed by her male comparator, a licensed Arkansas attorney. Indeed, all of the tasks Newell claims that she performed while working at Bailey & Oliver could have been performed by a highly experienced and competent paralegal. She never claims that she performed tasks that only a licensed attorney could perform.

What separates a paralegal from a licensed attorney, among other things, is the degree of responsibility that is required. An attorney may assume the responsibility of signing off on legal pleadings; a paralegal may not. An attorney is responsible for meeting with clients, counseling them, and offering legal advice, while holding herself out as an attorney; a paralegal cannot do any of these things. An attorney may take a deposition; a paralegal may not. An attorney may appear of record in a court of law; a paralegal may not. For all intents and purposes, even though the tasks Newell performed on a daily basis were also ones performed by licensed attorneys, and even though she was held out by the firm as being equivalent to a licensed attorney who could appear in courts in the state of Arkansas, the fact is that she was not a licensed attorney—nor could she ever be in Arkansas (or, to the Court's knowledge, in any state in the United States), by virtue of the fact that she did not attend a law school accredited by the American Bar Association. *See* Arkansas Judiciary, *Rules Governing Admission to the Bar, Rule XII*, https://courts.arkansas.gov/rules-and-administrative-orders/rules-governing-admission-to-the-bar (last visited June 15, 2017) ("No candidate shall be allowed to take the bar examination unless the applicant has graduated, or completed the requisites for graduation, from a Law School approved by the American Bar Association.").

Even if the Court assumed that the tasks performed by Newell required equal skill and effort as compared to the tasks performed by Scott, Newell performed these tasks *in Arkansas*, for cases pending before Arkansas courts. She was not performing the tasks in England or Wales, or for English or Welsh courts. She fails to appreciate, for example, the fact that, although she might have helped to schedule depositions and prepare Oliver to take those depositions, she could not, by law, take any depositions herself. And similarly, she fails to appreciate the fact that the close relationships she claims she built over time with several clients were limited by the fact that she was not permitted, by law, to offer them any legal advice or answer their legal questions. All of the above facts lead to one inescapable conclusion: Newell's job was not equal to Scott's.

Allowing Newell to go forward on her EPA claim would potentially open the door to similar claims by paralegals, legal secretaries, and even disbarred attorneys, which would render the distinction between a licensed attorney and a paraprofessional or unlicensed attorney moot. This is a road the Court will not travel. For all of these reasons, Newell has failed to state a claim for wage discrimination under either Title VII or the EPA, and this claim will be dismissed.

### C. ADTPA

Newell's ADTPA claim must also be dismissed. Claims made under this statute concern unfair or unconscionable trade practices with respect to consumers. "The elements of such a cause of action are (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Skalla v. Canepari*, 2013 Ark. 415, at *15 (Oct. 24, 2013) (citing the ADTPA, Ark. Code Ann.

13

§ 4-88-113(f)). The allegations in the Complaint fail to state any facts supporting a consumer-oriented act or practice; the facts instead pertain to Defendants' employment practices within their business. *See The Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) ("The ADTPA, as interpreted by the Arkansas courts, does not apply to deception and fraud claims . . . when consumers are not deceived or defrauded."). This claim will therefore be dismissed.

### D. Fraud

Newell declines to bring a claim for breach of contract, though the facts in the Complaint establish the existence of an oral agreement and Newell's reliance on it. Instead, she asserts a cause of action for fraud. Establishing this claim requires evidence of: (1) a false representation of material fact made by the defendant, (2) the defendant's knowledge that the representation was false, (3) the defendant's intention to induce action or inaction by the plaintiff in reliance upon the representation, (4) the plaintiff's justifiable reliance on the representation, and (5) the plaintiff's damage as a result of the false representation. *First Ark. Bank & Trust v. Gill Elrod Ragon Owen & Sherman, P.A.*, 2013 Ark. 159, at *9-10 (2013).

Defendants argue that Newell has failed to state a valid fraud claim because the allegedly false representations made by Oliver were forward-looking, or promissory in nature, and under Arkansas law, broken promises or projections about future events cannot sustain a claim for fraud. Indeed, the Arkansas Supreme Court has held that "promises of future conduct in a contractual setting" are not equivalent to

14

"misrepresentation[s] that give rise to fraudulent conduct." *South County, Inc. v. First Western Loan Co.*, 315 Ark. 722, 727-28 (1994).

In the case at bar, the facts underlying the fraud claim amount to more than mere "puffery" on Oliver's part, with respect to the law firm's economic situation. Rather, the Complaint argues that Newell was fraudulently induced to enter into an employment contract with Bailey & Oliver, and that Oliver never intended to honor the terms of the contract and pay her the same compensation structure as an associate attorney.

> Arkansas law is that a promissory representation made in bad faith and without honest intention of performing the promise and for the purpose of inducing the promisee to enter into a contract, may be a proper foundation for a tort action for fraud and deceit where the party to whom the representation is made acts to his detriment in reliance on the representation.

*Starling v. Valmac Indus., Inc.*, 589 F.2d 382, 386-87 (8th Cir. 1979). Of course, a cause of action for fraud will not be stated when the facts show that the promisor merely "fail[ed] to perform a contractual obligation or . . . expresse[d] an erroneous opinion or ma[de] a prediction that d[id] not come true." *Id.* at 387.

Newell states enough facts to plead a fraud claim with particularity and to satisfy Rule 9(b)'s pleading standards. Her allegation of fraud, if proven at trial, would make voidable any contract she might have entered into with Oliver. "Fraud cannot be an agreement." *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 375-76 (2007) (quoting *Allen v. Overturf*, 234 Ark. 612, 615-16 (1962)). "To constitute fraud by false representation there must be a representation of alleged existing fact; that representation must be false in fact; it must be made with intent to deceive, and the person to whom it is made must believe it." *Id.*

According to the Complaint, Oliver, the firm's managing partner, promised Newell that the firm would change her title from "Paralegal" to "Attorney," begin holding her out to clients as an attorney and full member of the litigation team, and compensate her in exactly the same manner as the other associate attorneys on the team, despite the fact that Newell was not licensed to practice law in Arkansas. Newell maintains that Oliver never intended to make good on this promise, and instead induced her to give up her law practice in England, purchase a home in Arkansas near the law firm, and sink many hours of her time into the firm's litigation practice, with no prospect of remuneration commensurate with her time. She alleges that when her cases began settling and the firm began receiving large attorney's fee awards, she inquired of Oliver when she would be paid the promised bonuses, and he continued to lie to her, assuring her that the money would come later. She maintains that Oliver engaged in a campaign of delay tactics and excuses intended to induce her to continue to work for the firm, even though he never intended to compensate her as promised. Then, when Newell put her foot down and demanded she be paid the bonuses she was promised, Oliver dragged out the fact that she was not licensed to practice law in Arkansas, and thus, could not reasonably expect that she would be paid as the other licensed attorneys. Newell's Complaint states a claim for fraud in that it alleges a false representation by Oliver to Newell, made with the intent to deceive. It also alleges that Newell believed the false representation, relied on it, and was damaged as a result.

Defendants argue that it was unreasonable for Newell to trust Oliver and rely on his representations as to how she would be compensated, as Newell surely knew she was not a licensed Arkansas attorney, and therefore should have known that the firm would never

pay bonuses to her in the same way they would a licensed attorney. The Court disagrees with Defendants' reasoning and finds that Newell plausibly alleges that because of her many years of legal training in England, her license to practice law in England and Wales, and her ability to perform many of the tasks that a licensed Arkansas attorney could perform, she reasonably believed Oliver's promise that she would be receive bonuses in the manner of other attorneys on the litigation team. For all of these reasons, the fraud claim will be preserved.

### D. Promissory Estoppel and Unjust Enrichment

Arkansas law ordinarily precludes claims for unjust enrichment and promissory estoppel when the parties have an express contract. *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 612-13 (2005) (finding that existence of express contract precludes recovery in quasi-contract "for events arising out of the same subject matter"). However, in the instant matter, Newell contends that her contract with Oliver was fraudulently induced and was rendered void as a result. She requests equitable relief in quasi-contract for that reason, and the Court will allow these claims to proceed.

### E. Supplemental Jurisdiction

Now that the Court has dismissed the federal claims over which it had original jurisdiction, the next issue to consider is whether the Court should continue to exercise supplemental jurisdiction over the remaining state law claims. The supplemental jurisdiction statute at 28 U.S.C. § 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction" over state law claims "if . . . the district court has dismissed all claims over which it has original jurisdiction."

The United States Supreme Court has made clear that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right, and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997) (internal quotation and citations omitted). The factors that a court should consider when deciding whether to continue to retain jurisdiction over non-federal claims include "principles of economy, convenience, fairness, and comity." *Id.* at 173.

After due consideration, the Court finds that the Circuit Court of Benton County, Arkansas, where this matter was originally filed by the Plaintiff prior to Defendants' removal, is well-equipped to adjudicate the remaining state law claims. The parties are all residents of Benton County, and principles of economy, convenience, fairness, and comity favor remanding these claims to the state court that was Plaintiff's chosen forum.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion to Dismiss (Doc. 19) by Defendants Bailey & Oliver P.A., d/b/a Bailey & Oliver Law Firm, and attorney Sach Oliver is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** as to Counts One, Two, and Three. Count One, alleging gender discrimination pursuant to Title VII of the Civil Rights Act and the Arkansas Civil Rights Act, is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim; Count Two, alleging violations of the Equal Pay Act, is **DISMISSED WITH PREJUDICE**, as the Court finds that any attempted amendment of this cause of action in the context of the facts of this case would prove futile; and Count Three, alleging violations of the Arkansas Deceptive Trade Practices Act, is also

**DISMISSED WITH PREJUDICE**, as any attempted amendment of this cause of action in the context of the facts of this case would prove futile. The Motion is **DENIED** as to all other Counts.

**IT IS FURTHER ORDERED** that, as the Court declines to take supplemental jurisdiction over the remaining state law claims, the Clerk of Court is **DIRECTED** to immediately **REMAND** the case to the Circuit Court of Benton County, Arkansas, for further disposition.

**IT IS SO ORDERED** on this 22nd day of June, 2017.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE